221 F.3d 100 (2nd Cir. 2000)
 FRANCIS S., Petitioner-Appellant,
v.
JAMES C. STONE, Commissioner, New York Office of Mental Health; RENATE WACK, Director, Kirby Forensic Psychiatric Center, Respondents-Appellees.
ROBERT M. MORGENTHAU, District Attorney of New York County, Intervenor-Respondent-Appellee.
 Docket No. 97-2423
August Term 1999
 UNITED STATES COURT OF APPEALS
SECOND CIRCUIT
 Argued: Jan. 13, 2000
Decided: Aug. 9, 2000
 
 Appeal from the March 5, 1998, judgment of the United States District Court for the Southern District of New York (Lewis A. Kaplan, Judge), denying a petition for a writ of habeas corpus to challenge the recommitment of a state court defendant after entering a plea of not responsible by reason of mental disease or defect.
 Affirmed.
 Stephen J. Harkavy, New York, N.Y. (Karen Gomes Andreasian, Felice Wechsler, Mental Hygiene Legal Service, New York, N.Y., on the brief), for petitioner-appellant.
 Marion R. Buchbinder, Asst. Solicitor Gen., New York, N.Y. (Eliot Spitzer, N.Y. State Atty. Gen., Robert A. Forte, Dep. Solicitor Gen., New York, N.Y., on the brief), for respondents-appellees.
 Morrie I. Kleinbart, Asst. Dist. Atty., New York, N.Y. (Robert M. Morgenthau, Dist. Atty., Mark Dwyer, Asst. Dist. Atty., New York, N.Y., on the brief), for intervenor-respondent-appellee.
 Before: NEWMAN and SOTOMAYOR, Circuit Judges, and GOLDBERG,*. Judge.
 JON O. NEWMAN, Circuit Judge.
 
 
 1
 This appeal challenges the constitutionality of a state court order recommitting a defendant for mental health treatment nine years after he entered a plea of not responsible by reason of mental disease or defect. It also requires consideration of the new standard applicable to a federal court's exercise of habeas corpus jurisdiction under 28 U.S.C. § 2254(d) (1994 & Supp. IV 1998), as recently interpreted by the Supreme Court, see Terry Williams v. Taylor, 120 S. Ct. 1495 (2000) ("Terry Williams").[1] Francis S. appeals from the March 5, 1998, judgment of the United States District Court for the Southern District of New York (Lewis A. Kaplan, Judge) denying his petition for a writ of habeas corpus. See Francis S. v. Stone, 995 F. Supp. 368 (S.D.N.Y. 1998). Applying the restricted scope of habeas corpus review required by section 2254(d)(1), we affirm.
 
 Background
 I. The statutory scheme
 
 2
 New York statutes, like those of other states, distinguish between the procedures to be followed for the involuntary civil commitment of persons suffering from mental illness and the procedures that apply to persons charged with a crime and determined, by a plea or a verdict, to be "not responsible by reason of mental disease or defect" ("NRRMDD defendant"). N.Y. Crim. Proc. Law § 220.15 (McKinney 1993) (plea procedure) (hereinafter "CPL"). Involuntary civil commitment procedures mandate numerous protections, including a requirement that the party proposing confinement must prove by clear and convincing evidence that the person is mentally ill and poses a danger to himself or others. See In re John P., 265 A.D.2d 559, 559, 697 N.Y.S.2d 120, 121 (2d Dep't 1999) (construing N.Y. Mental Hyg. Law §§ 9.01, 9.33 (McKinney 1996)). For an NRRMDD defendant, the court orders an examination to determine the defendant's current mental condition, see CPL § 330.20(2)-(5), and then holds a hearing as to the appropriate disposition, see id. § 330.20(6). The court has three options: (1) a finding that the defendant suffers from "a dangerous mental disorder," defined in the margin,[2] in which event the court orders commitment to a secure facility, see id.; id. § 330.20(1)(f) (requiring confinement in a secure facility); (2) a finding that the defendant is "mentally ill," as defined in the margin,[3] but does not suffer from a dangerous mental disorder, in which event the court orders commitment to a secure facility pursuant to the Mental Hygiene Law, see N.Y. Mental Hyg. Law art. 9 (McKinney 1996 & Supp. 2000), with the possibility of transfer to a non-secure facility, see CPL § 330.20(1)(l), (11), and issues an "order of conditions," defined in the margin,[4] see id. § 330.20(7); (3) a finding that the defendant is not mentally ill, in which event the court releases the defendant either unconditionally or with an order of conditions, see id.
 
 
 3
 With respect to an NRRMDD defendant subject to an order of conditions, whether or not released from a mental health facility, the commissioner of mental hygiene or the district attorney may apply to the court that issued the order for a recommitment order when the applicant believes that the defendant has a dangerous mental disorder. See id. § 330.20(14). At a hearing the applicant must establish "to the satisfaction of the court," id., that the defendant has a dangerous mental disorder, in which event the court orders recommitment.
 
 
 4
 II. The Mental Condition and Litigation History of Francis S.
 
 
 5
 Mental condition. Francis S. ("Francis") has a long history of drug and alcohol abuse, in-patient and out-patient psychiatric treatment, and arrests and convictions for petty crimes. Although it is undisputed that Francis has some form of mental illness, his specific diagnosis has been disputed; his treating psychiatrists have disagreed as to whether he suffers from bipolar disorder (a serious psychosis) or from attention-deficit disorder.
 
 
 6
 The episode resulting in the NRRMDD plea. In October 1983, Francis was at the scene of a drug bust in Manhattan. When he refused to leave the scene, an officer attempted to arrest him for disorderly conduct. While the officer was attempting the arrest, Francis thrust a six-inch knife in his direction. Francis was arrested and charged with attempted assault in the first degree and criminal possession of a weapon in the third degree. Those charges ultimately resulted in the disposition that underlies the current litigation.
 
 
 7
 While those charges were pending, Francis was arrested in May 1984 in New Jersey and charged with larceny-related offenses. He was found incompetent to stand trial and was a patient in a psychiatric institution in New Jersey until April 1986 (he escaped briefly during that time). The New Jersey charges were dismissed.
 
 
 8
 After extradition to New York and release on bail, Francis was arrested twice early in 1987, once for driving while intoxicated and once for criminal possession of a controlled substance; he pled guilty to the latter charge and was sentenced to five days in jail.
 
 
 9
 The NRRMDD plea and related proceedings. In June 1987, Francis entered a NRRMDD plea to the 1983 New York assault and weapons charges. In connection with that plea, the driving while intoxicated charge was dismissed.
 
 
 10
 Following the NRRMDD plea, Francis was remanded to Kirby Forensic Psychiatric Center ("Kirby") for examination by two forensic psychiatrists, as required by CPL § 330.20(2). They concluded that Francis was mentally ill but did not suffer from a dangerous mental disorder. In August 1987, Francis's NRRMDD plea was accepted. The New York County Supreme Court held a hearing pursuant to CPL § 330.20(6) and found, consistent with the psychiatrists' reports, that Francis was "mentally ill," see note 3, supra (definition of "mentally ill"), but that he "does not have a dangerous mental disorder," see note 2, supra (definition of "dangerous mental disorder"). This was the first of two (possibly three) determinations that Francis did not suffer from a dangerous mental disorder that were made prior to the recommitment order challenged in the pending litigation. Following the requirements of section 330.20(7), the Court remanded Francis to the custody of the Commissioner of Mental Health and ordered him committed as a civil patient for four months. The Court also issued an "order of conditions," see note 4, supra (definition of "order of conditions"), which required Francis to comply with his treatment plan and not to leave any facility without authorization while in the Commissioner's custody.
 
 
 11
 From the NRRMDD plea to the challenged recommitment proceeding. Pursuant to the court order, Francis was transferred from Kirby, a secure psychiatric facility, to an in-patient program at the Coney Island Unit of South Beach Psychiatric Center ("South Beach"). In December 1987, Francis was discharged from South Beach, with plans to receive follow-up care at South Beach's out-patient clinic. Francis did not comply with the treatment plan.[5] In May 1988, the Commissioner attempted to recommit Francis pursuant to CPL § 330.20(14). When located in January 1990, he was committed to Kirby for a psychiatric examination. In July 1990, the New York Supreme Court denied the application for recommitment on a finding for a second time that Francis was mentally ill but did not suffer from a dangerous mental disorder. The Court remanded Francis to the Commissioner for treatment as a civil patient at a non-secure facility, and issued a modified order of conditions. Under that order, Francis was required, after release, to attend an outpatient program approved by the Commissioner, to inform the prosecutor of his current address, and to abstain from alcohol and non-prescription drugs.
 
 
 12
 Pursuant to the Court's remand order, Francis was again hospitalized at South Beach from July to November 1990. He protested his continued retention and in November 1990 the New York Supreme Court ordered his release, subject to the same order of conditions.[6] Upon his discharge from South Beach in 1990, Francis went to live with family members in LeRoy, New York, and to receive out-patient treatment at a nearby facility. He left LeRoy for New York City in mid-December 1990. In February 1991, the Commissioner referred Francis to South Beach; however, after attending one appointment there and failing to attend another scheduled appointment, Francis sought treatment from Dr. Nels Langsten of the Metropolitan Hospital. Francis was seen by Langsten four or five times over the next year and a half.[7]
 
 III. The Challenged Recommitment Proceeding
 
 13
 New York Supreme Court. In August 1992, the Commissioner commenced a second recommitment proceeding, the one that is challenged in the pending litigation. This second application was filed on August 4, 1992, three days before the expiration of the five-year order of conditions that had been initially imposed when Francis's NRRMDD plea was accepted.[8] The New York Supreme Court (Edith Miller, Justice) took extensive testimony concerning Francis's mental state, with six psychiatric experts testifying. There was also extensive testimony concerning Francis's past criminal conduct.
 
 
 14
 The Court denied the recommitment application. Justice Miller explained her ruling in an oral decision from the bench:
 
 
 15
 The Court has reluctantly concluded that the burden of demonstrating by a preponderance of the evidence that Mr. S[.] suffers from a dangerous mental disorder has not been met.
 
 
 16
 The Court is bound by the authority of People versus Torres, because that case holds that it must be established that Mr. S[.] currently -- and I stress the word currently -- poses a physical danger to himself or others.
 
 
 17
 The Court finds that the defendant is mentally ill. All the psychiatrists have testified that he is mentally ill. Mr. S[.] suffers from alcohol dependence and polysubstance abuse. He has an antisocial personality disorder, he has a narcissistic personality disorder and he has attention[-]deficit hyperactivity disorder. The only area where there is some disagreement concerns whether he is also manic depressive.
 
 
 18
 Since the hospital records have not recorded the present incidents, it only documents manic incidents, the diagnosis is not conclusive at this time.
 
 
 19
 However, with regard to his current behavior in the hospital, they have not had the patient engaging in aggressive ideation or physical fights or suicide attempts. The record reflects that Mr. S[.] is intrusive, is demanding, is argumentative, he threatens to sue the staff whenever he perceives he has been slighted or whenever restrictions are placed on him. We do not have classic psychotic symptoms such as hallucinations, delusions or disorders in communication.
 
 
 20
 Mr. S[.] is a master of manipulation. He uses the criminal justice system to his benefit, so he has spent relatively little time in jail in spite of his 26 arrests. In the hospital, because he wants to get out, and also because he is in a structured environment, his behavior is more controlled.
 
 
 21
 ....
 
 
 22
 Based on his history, the Court also finds it is highly likely that whenever Mr. S[.] is released from the hospital, he will get into trouble again, for the following reasons:
 
 
 23
 He violated the order of conditions this time, as he has violated the order of conditions in the past, because he does not accept them fully. He cannot accept limits.
 
 
 24
 His outbursts in the courtroom diminished because of the structured hospital setting, and because he is regularly taking Cylert. But when he's outside the hospital, the patient does not take medication regularly. Reasonable requests to have him move on have resulted in him defying police officers, bartenders, restaurant employees, etc.
 
 
 25
 Although the patient states that alcohol and drugs have plagued him for years, he is not consistent in his treatment. Based on his past history, he will not commit himself to the A.A. program totally and with sufficient regularity for success.
 
 
 26
 The patient is verbally provocative, even with his fiance. He cannot control himself to refrain from escalating incidents. Such behavior has led to his numerous arrests. He never learns from his past experience.
 
 
 27
 ... He has constantly moved from program to program. This is what he has done in the past. He never stays at any one program and complies with it 100 percent, so that progress can be made. He never moves from square one. And if he's released from the hospital he probably will continue that same behavior.
 
 
 28
 However, the law does not permit me to confine Mr. S[.] to a secure hospital, because he is not currently dangerous.
 
 
 29
 Yet based on his limitations and his past history, it is highly likely that if he is released he will not attend A.A. regularly, he will not continue to take Cylert, even though he's benefited by it, he will not stop provoking people, he will not accept lawful authority, he will not respect the rights of others; because he considers that he alone is the ultimate judge of what is proper and reasonable behavior.
 
 
 30
 Appellate Division. The Appellate Division reversed and granted the Commissioner's application for recommitment. See In re Francis S., 206 A.D.2d 4, 618 N.Y.S.2d 660 (1st Dep't 1994). The Appellate Division first considered Justice Miller's finding that Francis, although mentally ill, was not suffering from a dangerous mental disorder. Her finding was rejected on the ground that the evidence showed (as she herself had found) that Francis would resume use of drugs and alcohol if released, see id. at 19, 618 N.Y.S.2d at 669, and because the three psychiatrists who testified for the State agreed that if he used drugs and alcohol again, he would revert to his prior pattern of dangerous behavior, see id. In an effort to establish the critical link between Francis's mental illness and his dangerousness, the Appellate Division said that the three psychiatrists who testified for the State "agreed that until [Francis] acknowledges his mental illness and abstains from drug and alcohol abuse he will continue to have a dangerous mental disorder." Id. The Appellate Division also stated that Francis's likely dangerous behavior "demonstrat[ed,]" in the view of the State's psychiatrists, "a dangerous mental disorder." Id.
 
 
 31
 The Appellate Division then stated that Justice Miller's finding of no current dangerousness had been erroneously grounded on a misunderstanding of In re Torres, 166 A.D.2d 228, 560 N.Y.S.2d 440 (1st Dep't 1990), aff'd for reasons stated, 78 N.Y.2d 1085, 578 N.Y.S.2d 870 (1991). The appellate court understood Justice Miller to have read Torres to mean that a person abstaining from drugs and alcohol in a controlled setting is not dangerous even if that person is highly likely to revert to drug and alcohol abuse, and consequent dangerous conduct, once released. Torres, the Appellate Division explained, merely affirmed a finding of non-dangerousness for a person being transferred from a secure facility to a non-secure facility, "which would still monitor his medication." Francis S., 206 A.D. 2d at 20, 618 N.Y.S.2d at 669.
 
 
 32
 Finally, the Appellate Division considered Francis's constitutional argument that once he had been found not dangerous in the 1987 NRRMDD plea proceeding, recommitment under section 330.20(14) as a person suffering from a dangerous mental disorder required a civil commitment proceeding at which the finding of dangerous mental disorder must be made by clear and convincing evidence. The appellate court said that this contention had previously been rejected in In re Lloyd Z., 176 A.D.2d 807, 575 N.Y.S.2d 327 (2d Dep't 1991), appeal dismissed, 79 N.Y.2d 851, 580 N.Y.S.2d 200 (1992). In addition, the Appellate Division said, if the applicable standard were "clear and convincing evidence," it would find that standard met in Francis's case. Francis S., 206 A.D.2d at 21, 618 N.Y.S.2d at 670. Then-Presiding Justice Murphy dissented. See id. at 23-81, 618 N.Y.S.2d at 672-705.
 
 
 33
 Court of Appeals. The Court of Appeals unanimously affirmed. See In re Francis S., 87 N.Y.2d 554, 640 N.Y.S.2d 840 (1995). As to the factual finding of dangerousness, the Court of Appeals stated:
 
 
 34
 Supreme Court applied an erroneous legal standard in finding that the second element of a dangerous mental disorder--his current dangerousness as a result of his mental illness--had not been established solely because [Francis]'s condition was stabilized during hospitalization. On the other hand, the Appellate Division majority quite properly based its determination that [Francis] had a dangerous mental disorder on his history of prior relapses into violent behavior and of recurrent substance abuse and noncompliance with treatment programs upon release. Thus, in our view, the Appellate Division's finding of [Francis]'s present dangerousness more nearly comports with the evidence in the record.
 
 
 35
 Id. at 561, 640 N.Y.S.2d at 842-43 (citations omitted).
 
 
 36
 On the constitutional claims, the Court of Appeals rejected Francis's equal protection challenge to recommitment procedures for NRRMDD defendants that differed from civil commitment:
 
 
 37
 As we have repeatedly recognized, ... the provisions of CPL 330.20 for imposing orders of conditions through which the criminal court retains supervisory authority over insanity acquittees, and the section authorizing recommitment upon a finding that an acquittee has a dangerous mental disorder, reflect a legislative judgment that, having concededly once engaged in criminal conduct as a result of mental illness, the insanity acquittee continues to present a serious risk of a recurrence of dangerous behavior derived from mental illness.
 
 
 38
 Id. at 562, 640 N.Y.S.2d at 843. Moreover, the Court added, "equal protection principles do not prevent different treatment of insanity acquittees from other persons subject to civil commitment because acquittees may validly be regarded as a separate class, even when no longer diagnosed as having a dangerous mental disorder." Id. at 563, 640 N.Y.S.2d at 844.
 
 
 39
 The Court of Appeals rejected Francis's substantive due process challenge, ruling that "recommitment of an insanity acquittee upon a finding of a dangerous mental disorder has a direct and substantial relationship with the State's legitimate concern for the potentiality of the deterioration of the acquittee's mental condition and relapse into dangerous behavior." Id. at 564, 640 N.Y.S.2d at 845. The Court of Appeals also rejected Francis's procedural due process challenge, relying on Jones v. United States, 463 U.S. 354 (1983), in ruling that the preponderance of the evidence standard was sufficient for demonstrating the dangerousness of an insanity acquittee for purposes of a recommitment hearing. See Francis S., 87 N.Y.2d at 564, 640 N.Y.S.2d at 844-45.
 
 IV. Habeas Corpus Proceedings
 
 40
 District Court. In 1997, Francis brought the pending habeas corpus petition in the United States District Court for the Southern District of New York (Lewis A. Kaplan, District Judge). The petition included three claims: (1) New York's recommitment scheme, as applied to Francis, denies equal protection of the laws and procedural due process because it permits recommitment of a person, initially lawfully committed upon his NRRMDD plea, who has subsequently been found not dangerous, without according him the procedural protections state law requires for civil commitment of the mentally ill; (2) the New York Court of Appeals's interpretation of a "dangerous mental disorder," sufficient to warrant recommitment, violates substantive due process, as applied to Francis, because it permits confinement of a person with no symptoms of mental illness based on a prediction that he will get into trouble when released; (3) even if the standard as applied to Francis is constitutional, the state appellate courts' finding of present dangerousness was unreasonable in light of the evidence.[9]
 
 
 41
 The District Court rejected all three claims. Judge Kaplan rejected the equal protection/procedural due process claim on the ground that rational basis inquiry was sufficient and that the state's distinction between NRRMDD defendants and those subject to civil commitment survived that inquiry. See Francis S., 995 F. Supp. at 382-85. He rejected as without merit the claim that the state's standard for recommitting a NRRMDD defendant violated substantive due process by impermissibly basing a prediction of dangerousness on the likelihood that Francis would discontinue use of medication outside the hospital and then revert to a pattern of dangerous conduct. See id. at 385-86. As to the third claim, the Court ruled that whether it treated the finding of dangerousness as a purely factual issue or as a mixed issues of law and fact, it was "abundantly clear that more than sufficient evidence was presented on the record to justify petitioner's recommitment." Id. at 387. The Court granted a certificate of appealability ("COA") on the first and second claims. See id. at 388.
 
 
 42
 Motion Practice in the Second Circuit. On a motion by Francis, this Court expanded the COA to include his third claim: whether he was denied substantive due process because "the state court's determination that appellant suffers from a 'dangerous mental disorder' was unreasonable in light of the evidence adduced at the recommitment hearing." The Court also instructed the parties to brief the issue of the proper standard of review to be applied to the case under the 1996 amendments to 28 U.S.C. § 2254(d).
 
 Discussion
 
 43
 I. The New Section 2254(d) Standard of Review
 
 
 44
 We consider first the standard of review applicable to federal court consideration of habeas corpus petitions challenging state court judgments. The pertinent provision of the federal habeas corpus statute, 28 U.S.C. § 2254(d), was amended in 1996 by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, 1219 (1996).
 
 
 45
 Section 2254(d), as amended by AEDPA, reads:
 
 
 46
 (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
 
 
 47
 (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
 
 
 48
 (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
 
 
 49
 Francis's first two claims contend that the New York courts have ordered his recommitment on the basis of rulings that are either "contrary to" or "involve an unreasonable application of" federal law as established by the Supreme Court, within in the meaning of section 2254(d)(1). His third claim contends that the recommitment is "based on an unreasonable determination of the facts in light of the evidence," within the meaning of section 2254(d)(2). We must therefore consider our standard of review under both subsections before considering the merits of the three claims.[10]
 
 
 50
 Section 2254(d)(1). The Supreme Court recently decided its first case involving a construction of section 2254(d)(1). See Terry Williams v. Taylor, 120 S. Ct. 1495 (2000). The Court issued two opinions on the interpretation of section 2254(d)(1). The opinion of the Court on the statutory interpretation issue is by Justice O'Connor, writing Part II of her opinion, see id. at 1518-23, for herself, the Chief Justice, and Justices Scalia, Kennedy, and Thomas. See id. at 1516.[11] Another view of section 2254(d)(1) is contained in an opinion by Justice Stevens, writing Part II of his opinion, see id. at 1503-11, for himself and Justices Souter, Ginsburg, and Breyer. See id. at 1499 (opinion of Stevens, J.). Thus, the Court voted 5-4 to adopt Justice O'Connor's interpretation of section 2254(d)(1). However, the opinion of the Court containing the application of section 2254(d)(1) to the state court decision at issue is Part IV of Justice Stevens's opinion (for himself and Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer). See id. at 1499.
 
 
 51
 Part II of Justice O'Connor's opinion offers guidance on the meaning of the three key phrases in section 2254(d)(1)--a state court decision (1) "contrary to" or (2) that "involved an unreasonable application of" (3) "clearly established Federal law, as determined by the Supreme Court of the United States. As to the last phrase, she explained that a rule is "clearly established" within the meaning of section 2254(d)(1) when it "would qualify as an old rule" under Teague v. Lane, 489 U.S. 288 (1989), see Terry Williams, 120 S. Ct. at 1523, subject to the qualification that section 2254(d)(1) "restricts the source of clearly established law to this Court's jurisprudence," id. And Justice O'Connor explicitly ruled that the "clearly established" phrase "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." Id.
 
 
 52
 The "contrary to" phrase also presented no serious difficulty. "[T]he state court decision must be substantially different from the relevant precedent of this Court" or must "appl[y] a rule that contradicts the governing law set forth in our cases." Id. at 1519. She offered as a hypothetical example a state court decision that rejected a claim of constitutionally ineffective assistance of counsel on the ground that the prisoner had not shown by a preponderance of the evidence that the result would have been different in the absence of deficient representation, in disregard of the standard in Strickland v. Washington, 466 U.S. 668, 694 (1984), that requires that the prisoner show only a reasonable probability of a different result. See Terry Williams, 120 S. Ct. at 1519. Thus, state court use of an incorrect legal standard can result in a decision "contrary to" established Supreme Court law.
 
 
 53
 The "unreasonable application" phrase proved more troublesome. Initially, Justice O'Connor, citing the Fourth Circuit's decision in Green v. French, 143 F.3d 865. 869-70 (4th Cir. 1998), noted two ways that a state court decision might violate the "unreasonable application" phrase:
 
 
 54
 First, a state court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.
 
 
 55
 Terry Williams, 120 S.Ct. at 1520 (emphases added). Justice O'Connor, however, declined to accept or reject the second part of the Fourth Circuit's analysis.
 
 
 56
 Turning to the key issue of the meaning of "unreasonable" in the context of the "unreasonable application" phrase, Justice O'Connor acknowledged more difficulty. "The term 'unreasonable' is no doubt difficult to define." Id. at 1522.[12] Her construction of the phrase clearly indicates what the phrase does not mean. First, the phrase is not to be interpreted as strictly as the Fourth Circuit read it in Green v. French, 143 F.3d 865 (4th Cir. 1998), when that Court ruled that the standard is met only if the state court has applied federal law "in a manner that reasonable jurists would all agree is unreasonable," id. at 870. This view was "erroneous," Justice O'Connor wrote, because the "'all reasonable jurists' standard would tend to mislead federal habeas courts by focusing their attention on a subjective inquiry rather than on an objective one." Terry Williams, 120 S. Ct. at 1521- 22. Second, the phrase does not mean "that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 1522. "Rather, that application must also be unreasonable." Id. However, between these two standards (merely erroneous and unreasonable to all reasonable jurists), the only guidance we receive from Justice O'Connor's opinion is that we are to ask "whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 1521.
 
 
 57
 We gain some insight into how we should interpret the phrase "objectively reasonable" in the context of state court applications of Supreme Court precedents by examining how the majority applied the phrase in the Terry Williams case. The issue on the merits concerned the performance of counsel at the death penalty phase of a state court criminal trial. The Virginia Supreme Court had assumed that counsel's performance was constitutionally deficient, see Williams v. Warden, 254 Va. 16, 23-26, 487 S.E.2d 194, 198 (1997), thus satisfying the first prong of Strickland. The principally disputed issue was whether the habeas petitioner had demonstrated "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. On this issue, the Supreme Court ruled by a 6-3 vote that the Virginia Court's application of the prejudice prong of Strickland to the facts of the Terry Williams case was objectively unreasonable. On this critical issue, Part IV of Justice Stevens's opinion is the opinion of the Court. See Terry Williams, 120 S. Ct. at 1499. However, nothing in Part IV of Justice Stevens's opinion, see id. at 1512-16, indicates whether he is applying his interpretation of the "unreasonable application" phrase of section 2254(d)(1), which is contained in Part III of his opinion and which was rejected by the Court's majority, or Justice O'Connor's interpretation, which is contained in Part II of her opinion and which was adopted by the Court's 5-4 majority. Part III of Justice O'Connor's opinion, for herself and Justice Kennedy, also discusses the unreasonableness of the state court's analysis, see id. at 1523-25 (opinion of O'Connor, J.), and we may safely assume that she is applying the interpretation in Part II of her opinion in joining Part IV of Justice Stevens's opinion.
 
 
 58
 The principal flaw in the Virginia court's analysis of prejudice appears to have been its failure to consider how significant would have been the mitigating evidence that trial counsel did not develop at the death penalty phase. See Terry Williams, 120 S. Ct. at 1513-14. What elevates this omission from "merely erroneous" to "objectively unreasonable" is difficult to learn.
 
 
 59
 Since the Supreme Court's decision in Terry Williams, several circuits have adjudicated habeas corpus cases involving the "unreasonable application" phrase of section 2254(d)(1), although the meaning of the phrase in practice remains uncertain. In two cases, our Circuit concluded that the state court decision was correct. See Sacco v. Cooksey, 214 F.3d 270, 273-74 (2d Cir.2000); Clark v. Stinson, 214 F.3d 315, 321-23 (2d Cir.2000). Two circuits have ruled that the state court committed error, but not an error involving an unreasonable application of Supreme Court precedent. See Tucker v. Catoe, Nos. 99-14, 99-15, F.3d, 2000 WL 763597, at *13-15 (4th Cir. June 13, 2000); Van Tran v. Lindsey, 212 F.3d 1143, 1158-59 (9th Cir. 2000). One circuit has found that a state court decision involved an unreasonable application of Supreme Court precedent, but denied relief on other grounds. See Holman v. Kemna, 212 F.3d 413, 417 (8th Cir. 2000).
 
 
 60
 The Fourth Circuit deemed the state court decision not an unreasonable application because the issue was "close." Tucker, 2000 WL 763597, at *15. The Ninth Circuit used the "clear error" standard appropriate for review of factual findings, concluding that it was not clearly convinced that the state court had erred. Van Tran, 212 F.3d at 1153-54, 1159. That approach, however, focuses on how sure the habeas court is that the state court has committed error, not whether the state court decision reveals an increment of wrongness beyond error. Of course, a habeas court will likely be firmly convinced of its conclusion whenever a state court has committed a mistake more egregious than error, but it might also be firmly convinced that just an ordinary error has occurred.
 
 
 61
 Before Terry Williams, two circuits had used an "objectively unreasonable" standard in applying section 2254(d)(1). The Third Circuit had ruled that the state court decision was correct and, in any event, not an unreasonable application of Supreme Court precedent because the issue on the merits was "close." Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 889 (3d Cir. 1999) (in banc). The Eighth Circuit had twice ruled that an unreasonable application had occurred, but without articulating what rendered the state court decision more than erroneous. See Atley v. Ault, 191 F.3d 865, 871-73 (8th Cir. 1999); Long v. Humphrey, 184 F.3d 758, 761 (8th Cir. 1999).
 
 
 62
 As an abstract proposition, we can only echo Justice O'Connor's virtually tautological statement that to permit habeas relief under the "unreasonable application" phrase, a state court decision must be not only erroneous but also unreasonable. Some increment of incorrectness beyond error is required. We caution, however, that the increment need not be great; otherwise, habeas relief would be limited to state court decisions "so far off the mark as to suggest judicial incompetence." Matteo, 171 F.3d at 889. We do not believe AEDPA restricted federal habeas corpus to that extent.
 
 
 63
 II. Equal Protection/Procedural Due Process Claim
 
 
 64
 Francis's combined equal protection and procedural due process claim is premised on the two explicit state court findings, preceding the challenged recommitment order, that he does not suffer from a dangerous mental disorder. The first finding was made in 1987, after the examination that was triggered by his NRRMDD plea. The second finding was made in 1990 when the State Supreme Court rejected the Commissioner's first recommitment application. Francis contends that as a person who, even if mentally ill, has been judicially found not to be dangerous, he may not be confined under procedures different from those used for civil commitment of the mentally ill because the distinction New York has made does not survive the "heightened" level of constitutional scrutiny, see Brief for Appellant at 25, that the Supreme Court requires for review of procedures for commitment of persons acquitted by reason of insanity, or, in Francis's case, convicted on a plea of not responsible by reason of mental disease or defect.
 
 
 65
 We agree with Francis that an intermediate level of scrutiny is appropriate for his equal protection claim. The Supreme Court has ruled that "commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." Addington v. Texas, 441 U.S. 418, 425 (1979). Although a person previously adjudicated to be mentally ill might not be entitled, when challenging recommitment while subject to an order of conditions, to all of the same protections available to a person initially committed as mentally ill, the Court has made it clear that substantial protection is due a person notwithstanding a diagnosis of mental illness. Thus, in Baxstrom v. Herold, 383 U.S. 107 (1966), a prisoner administratively determined to be mentally ill and confined to a prison hospital, whose sentence was about to expire, was held to be denied equal protection of the laws when he was subjected to civil commitment under a special procedure applicable to prisoners, rather than the procedures used for civil commitment of all other persons. See id. at 110. Similarly, in Humphrey v. Cady, 405 U.S. 504 (1972), the Court found a substantial equal protection claim where a state applied a commitment renewal, extending beyond the period of an allowable sentence, to a defendant initially sentenced to a "sex deviate facility", rather than the procedures normally used for civil commitment. See id. at 510-11. Moreover, in Jones v. United States, 463 U.S. 354 (1983), the Court, in upholding the brief, 50-day commitment following a verdict of not guilty by reason of insanity ("NGRI"), emphasized the Government's "important interest" in automatic commitment, id. at 366, and the reasonableness of the inference of mental illness, at least for 50 days, continuing from the NGRI verdict, see id. Although Jones surely did not subject the statutory scheme to strict scrutiny, there is no indication that only a rational relationship test was applied. Some form of intermediate level scrutiny appears to have been used. Cf. Buthy v. Commissioner, 818 F.2d 1046, 1049-50 (2d Cir. 1987) (applying test of "rational means to serve a legitimate end" to reject equal protection challenge to more onerous restrictions on hospitalized insanity acquittees than on civilly committed patients, where fact of confinement was not challenged) (quoting City of Cleburne v. Cleveland Living Center, Inc., 473 U.S. 432, 442 (1985)); see also Charles W. v. Maul, No. 98-9290 (2000 WL 713905, at *9-*10 (2d Cir. June 5, 2000) (upholding qualified immunity defense to similar claim).
 
 
 66
 In rejecting Francis's equal protection claim, the New York Court of Appeals did not make entirely clear what level of scrutiny it was applying. In its discussion of Francis's equal protection claim, the Court said only that the statutory provisions for an order of conditions and for subsequent recommitment on a finding that a NRRMDD defendant has a dangerous mental disorder, "reflect a legislative judgment that, having concededly once engaged in criminal conduct as a result of mental illness, the insanity acquittee continues to present a serious risk of a recurrence of dangerous behavior derived from mental illness." Francis S., 87 N.Y.2d at 562, 640 N.Y.S.2d at 843. The fact that the recommitment procedures "reflect a legislative judgment" that the NRRMDD defendant poses a risk of dangerous behavior does not indicate what level of scrutiny is being applied to determine whether that judgment comports with equal protection requirements.
 
 
 67
 The Court of Appeals adverted to the appropriate level of scrutiny in two ways in rejecting Francis's procedural due process argument. First, the Court said that "[t]he Legislature's rationally based apprehension of significant risk that a person, whose mental illness resulted in the commission of a crime, may relapse into dangerousness, also surmounts due process concerns." Id. at 563, 640 N.Y.S.2d at 844 (emphasis added). This sounds like minimal scrutiny under a rational relationship test. Then the Court said:
 
 
 68
 The recommitment procedures of CPL 330.20 also comport with principles of substantive due process. As we have already demonstrated, recommitment of an insanity acquittee upon a finding of a dangerous mental disorder has a direct and substantial relationship with the State's legitimate concern for the potentiality of the deterioration of the acquittee's mental condition and relapse into dangerous behavior.
 
 
 69
 Id. at 564, 640 N.Y.S.2d at 845 (emphasis added). Despite the one use of the phrase "rationally based," we think the totality of the Court's opinion reflects the use of a level of scrutiny more rigorous than rational relationship, one that captures the essence of the intermediate level of scrutiny that the Supreme Court has applied in similar contexts.
 
 
 70
 The Court of Appeals's use of the correct standard eliminates any concern that its decision is "contrary to" established federal law, but the question remains whether the decision is an "unreasonable application" of such law. More precisely, the issue is whether, under intermediate scrutiny, New York's recommitment procedures, rather than the normal civil commitment procedures, may be applied to an NRRMDD defendant under an order of conditions after judicial determinations that the defendant, although mentally ill, is not suffering from a dangerous mental disorder.
 
 
 71
 Francis contends that the adjudications that he was not dangerous ended whatever inference of likely dangerousness flowed from his 1987 NRRMDD plea and made it unreasonable for the state to commit him without using the normal civil commitment procedures. There is considerable force to Francis's argument. If it was a denial of equal protection not to use normal civil commitment procedures for Baxstrom, a mentally ill prisoner whose dangerousness was indicated by his conviction of a crime, it would seem equally necessary to use the normal procedures for Francis, a mentally ill NRRMDD defendant who has at least twice been judicially determined not to be suffering from a dangerous mental illness. Baxstrom is not decisive, however, since, unlike Francis, he had never been adjudicated mentally ill based on his own plea; he was a prisoner whom prison authorities had administratively determined should be confined in a prison hospital. Also helpful to Francis's claim is the Supreme Court's statement in Jones that "the committed [insanity] acquittee is entitled to release when he has recovered his sanity or is no longer dangerous." 463 U.S. at 368. That statement, however, is not decisive, since the Court's holding was limited to the initial commitment procedures, and the Court explicitly declined to adjudicate the applicable release procedures. See id. at 363 n.11.
 
 
 72
 Finally, Francis seeks support from the Supreme Court's decision in Foucha v. Louisiana, 504 U.S. 71 (1992), which invalidated use of special commitment procedures for an insanity acquittee who no longer suffered from a mental illness. Francis relies on the Court's observation that Foucha could not be retained in a mental institution "absent a determination in civil commitment proceedings of current mental illness and dangerousness." Id. at 78. Francis draws from Foucha the rule that civil commitment must be used for an insanity acquittee who is either no longer mentally ill or no longer dangerous. It is arguable that the Supreme Court would have ruled in favor of Foucha if he had been mentally ill but no longer dangerous, but the holding is only that civil commitment procedures are required for an insanity acquittee who is no longer mentally ill.
 
 
 73
 We consider it a close question whether the adjudications that Francis did not suffer from a dangerous mental disorder in 1987 and 1990 obliged New York to use the normal civil commitment procedures to recommit him thereafter. As an initial question of federal constitutional law, unconstrained by section 2254(d)(1), we might well rule that an equal protection violation has been shown. Applying the standard of "objective unreasonableness" required by section 2254(d)(1), however, we cannot say that it was objectively unreasonable for the New York Court of Appeals to reject Francis's equal protection claim. No clearly established federal law, as enunciated by the Supreme Court, required the claim to be upheld. Even if only a small increment beyond error is needed to meet the standard of "objectively unreasonable," we do not believe it is present in the Court of Appeals's decision.
 
 III. Substantive Due Process Claim
 
 74
 Francis contends that the state court decision recommitting him used a standard that violates the requirements of substantive due process because it permits recommitment of a person who once was, but is no longer, mentally ill, upon a prediction of future dangerousness unconnected to mental condition. Preventive detention of that sort, he argues, is contrary to the Supreme Court's decision in Foucha. As we have noted, Foucha concerned an insanity acquittee who had been determined not to be suffering from a mental illness.[13] Francis's invocation of Foucha rests on his premise that he is not currently suffering from a mental illness, although he also argues at various points that what is lacking is a finding of "an active mental illness," Brief for Appellant at 48, or "current symptomatology that rendered [Francis] dangerous," id. at 49. The premise is incorrect. Justice Miller in the state trial court found that Francis was "mentally ill," and her finding was accepted by the state reviewing courts. See Francis S., 87 N.Y.2d at 560-61, 640 N.Y.S.2d at 842. As she noted, "All the psychiatrists have testified that he is mentally ill." This finding is "presumed to be correct," and Francis has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The deference due the finding of mental illness is not diminished by the fact that one psychiatrist acknowledged that is was "conceivable" that Francis was not suffering from bipolar disorder, nor that another expressed "some doubts" about his diagnosis.
 
 
 75
 The seriously disputed issue at the recommitment hearing was whether Francis suffered from a dangerous mental illness, that is, whether his future dangerousness was attributable to his mental illness. Francis is simply incorrect in arguing that the recommitment order is not based on a finding that his dangerousness is attributable to his mental illness. Whether the Appellate Division was entitled to disagree with Justice Miller on this finding is the issue we next consider.
 
 
 76
 IV. Claim That the State Court Finding of Dangerousness Was Unreasonable
 
 
 77
 Francis challenges the finding of the Appellate Division, affirmed by the Court of Appeals, that he is dangerous by reason of his mental illness. He contends that this finding is unreasonable in light of the evidence presented.
 
 
 78
 In considering this claim, we encounter an initial issue as to the appropriate scope of our review and the standard to be applied. As to scope of review, Francis acknowledges the deference that section 2254(e)(1) requires for a state court finding of fact, but contends that whether he suffers from a dangerous mental disorder is a mixed question of law and fact, as to which a federal habeas corpus court should conduct an independent review. See Thompson v. Keohane, 516 U.S. 99, 102 (1995) (holding that "custody" for purposes of required Miranda warnings is mixed question of law and fact warranting independent review).
 
 
 79
 A finding of dangerous mental illness would seem to have at least the same degree of factual content as a finding that mental illness so impaired a person's judgment that the person is mentally incompetent to stand trial, and that issue has generally been held to be an issue of fact, entitled to deference by a federal habeas corpus court. See Maggio v. Fulford, 462 U.S. 111, 117 (1983); Bryson v. Ward, 187 F.3d 1193, 1201 (10th Cir. 1999); Vargas v. Lambert, 159 F.3d 1161, 1168 (9th Cir. 1998); O'Rourke v. Endell, 153 F.3d 560, 567 (8th Cir. 1998); Oats v. Singletary, 141 F.3d 1018, 1025 (11th Cir. 1998); Moody v. Johnson, 139 F.3d 477, 481 (5th Cir. 1998); Estock v. Lane, 842 F.2d 184, 186 (7th Cir. 1988). Moreover, the Supreme Court has treated as a fact question entitled to deference a state court's finding of a defendant's mental competency to waive his right to pursue post-conviction remedies. See Demosthenes v. Baal, 495 U.S. 731, 735 (1990). We think a state court finding of dangerous mental illness is as entitled to deference on habeas corpus review as a finding of competency to stand trial.[14]
 
 
 80
 Even if the finding of dangerous mental illness were not entitled to deference as a finding of fact, a further preliminary issue arises as to the appropriate standard of review. Francis assumes that he is entitled to habeas corpus relief if the state court finding is "unreasonable." Brief for Appellant at 52. He apparently relies on the second clause of section 2254(d), which provides that habeas corpus shall not be granted with respect to a state court ruling "unless the adjudication ... (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). However, this negative constraint on the authority of a federal habeas corpus court does not necessarily carry the affirmative implication that whenever a state court adjudication is based on "an unreasonable determination of the facts in light of the evidence," the writ should issue.[15] For example, the Supreme Court has instructed that a state court jury's finding of guilt is not to be rejected as a deprivation of liberty without due process of law unless it can be said that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979). The conclusion of a federal habeas corpus court that the jury's verdict was not "reasonably" supported by the evidence would not meet Jackson's high standard. Thus, we have some doubt whether a finding of dangerous mental illness may be disregarded simply because it is not "reasonable." Arguably, habeas relief may not be granted unless the confinement ruling lacks the evidentiary support needed to satisfy the requirements of the Due Process Clause. When ruling that a state court finding was not sufficiently supported to be entitled to deference by a federal habeas court, the Supreme Court has usually focused not on an ultimate finding, such as guilt or dangerous mental illness, but on some subsidiary historical fact important to an adjudication of some ultimate issue, such as voluntariness of a confession. See Townsend v. Sain, 372 U.S. 293, 320-22 (1963) (state court conclusion that confession was voluntary inadequately supported for lack of findings of historical facts), partially overruled on other grounds by Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992)).
 
 
 81
 In any event, even if we were to assume that habeas corpus relief would be warranted upon our determination that the state court's finding of dangerous mental illness was not reasonable in light of the evidence, we would decline to reach such a conclusion. We readily acknowledge that the evidence of dangerous mental illness was in sharp dispute among the six psychiatrists who testified, and that the evidence from the state's doctors is subject to many of the criticisms persuasively catalogued by the dissenting Justice in the Appellate Division. See Francis S., 206 A.D. at 31-44, 618 N.Y.S.2d at 676-83 (Murphy, then-P.J., dissenting). However, the main dispute between the psychiatrists was not about whether Francis was dangerous; all agreed, at least to some extent, that he was likely to revert to the dangerous behavior that had characterized his conduct while an out-patient under an order of conditions. The real dispute was whether his future dangerousness could be attributed to his mental illness, as the State's psychiatrists believed, or only to the likelihood that he would fail to take needed medicines outside the controlled environment of a psychiatric hospital, a likelihood enhanced by the exacerbating effects of his alcohol and drug dependence, as Francis's psychiatric witnesses believed. On such a subtle issue, involving the uncertain relationship between predicted future conduct and the causative role of mental illness, each themselves subject to understandable dispute among experts, only a starkly deficient record would permit a federal habeas court to rule that a state court's finding of dangerous mental illness was not reasonably supportable. As Judge Kaplan noted, see Francis S., 995 F. Supp. at 387, the state court record was extensive. The hearing spanned three months, generated more than 1,500 pages of testimony, mostly from the six psychiatrists, and included 1,800 pages of Francis's psychiatric records.
 
 
 82
 Francis's assault on the state court evidence does not suffice. He identifies flaws but not fatal deficiencies. For example, he challenges the testimony of Dr. Delfin Ibanez on the ground that he examined Francis on only three or four occasions for a total of only two hours. See Brief for Appellant at 53. This might weaken the force of Dr. Ibanez's testimony but does not demonstrate the unreasonableness of relying upon it, in conjunction with all of the evidence. Francis scores points by noting that Dr. Ibanez was caught in an evident misstatement in claiming that he based his diagnosis on incidents disclosed in some of Francis's court records, when in fact they had been under seal until just before his testimony. Nevertheless, he was entitled to base his opinion of future dangerousness related to mental illness on undisputed incidents of dangerous behavior put to him during direct examination.
 
 
 83
 Francis challenges the conclusions of Dr. Erasmo Cruz because this psychiatrist failed to consult the psychiatrists who had previously treated Francis. See Brief for Appellant at 57-58. But Dr. Cruz, the Director of Structured Treatment at South Beach had had some, although limited, clinical contact with Francis and had a sufficient basis to offer an opinion that supports a reasonable finding of a dangerous mental illness. Francis also understandably faults the testimony of Dr. Robert Poundstone, who treated Francis at Kirby, to the extent that this psychiatrist expressed the view that Francis's lack of physically dangerous actions while hospitalized was a symptom of mental illness "[i]n the sense of being calculating, ... that is, putting the best face forward, to conceal what might be behind."[16]
 
 
 84
 Although the absence of dangerous behavior while hospitalized is dubious evidence that Francis suffers from a dangerous mental illness, his dangerous conduct while an out-patient was reasonably linked to his mental illness by the three psychiatrists who testified for the Commissioner. Francis challenges their opinions by pointing out that he refrained from dangerous conduct while hospitalized during periods when, according to the State's doctors, he was either declining to take anti-psychotic medicine or such medicine was not being prescribed for him.[17] This demonstrates, he contends, that he would refrain from dangerous conduct outside the hospital even if he failed to take prescribed medication. The argument has some force, but does not so undermine the force of the contrary opinions as to render the state court's ultimate finding unreasonable. The State's psychiatrists evidently believed, and persuaded the state courts, that even though Francis could exercise sufficient control, without antipsychotic medication, to refrain from dangerous conduct within the structured setting of a psychiatric hospital, his mental disorder was likely to result in dangerous conduct outside such a setting. Then-Presiding Justice Murphy did not agree with this conclusion in the Appellate Division, and some members of this panel might not agree with it if the decision were ours to make as an initial matter. But even if we could regard the issue as a mixed question of law and fact not entitled to a presumption of correctness appropriate for determination of a factual issue, see 28 U.S.C. § 2254(e)(1), we would agree with the District Court that the decision of the Appellate Division, affirmed by the Court of Appeals, is not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," see 28 U.S.C. § 2254(d)(2).
 
 Conclusion
 
 85
 Francis's petition is troubling in two respects. The 1987 and 1990 state court findings that he was not then dangerous provide a substantial basis for his claim that his CPL recommitment upon a finding of dangerousness in 1994 denies him equal protection of the laws because the more protective civil commitment procedures of the Mental Hygiene Law were not used. In addition, the State's invocation of the CPL recommitment procedures just three days before the five-year order of conditions was to expire in 1992 has created Francis's understandable apprehension that his 1987 NRRMDD plea will subject him to a lifetime of successive CPL confinements without ever receiving the procedural safeguards that the Mental Hygiene Law requires for commitment and guarantees for release. On the first concern, we conclude, for the reasons stated, that federal habeas corpus relief is not available under the restricted scope of review now imposed on federal courts. On the second concern, we express no views as to what claims Francis might have in the future. The judgment of the District Court is affirmed. No costs.
 
 
 
 Notes:
 
 
 *
 Honorable Richard W. Goldberg of the United States Court of International Trade, sitting by designation.
 
 
 [1]
 We cite the case with Williams's first name to distinguish it from Michael Wayne Williams v. Taylor, 120 S. Ct. 1479 (2000), coincidentally decided the same day as Terry Williams v. Taylor, and also involving interpretation of a subsection of the federal habeas corpus statute, as amended by AEDPA, although a different subsection, 28 U.S.C. § 2254(e), from the one at issue in Terry Williams, 28 U.S.C. § 2254(d).
 
 
 [2]
 "'Dangerous mental disorder' means: (i) that a defendant currently suffers from a 'mental illness' as that term is defined in subdivision twenty of section 1.03 of the mental hygiene law, and (ii) that because of such condition he currently constitutes a physical danger to himself or others." CPL § 330.20(1)(c) (emphasis added).
 
 
 [3]
 "'Mentally ill' means that a defendant currently suffers from a mental illness for which care and treatment as a patient, in the in-patient services of a psychiatric center under the jurisdiction of the state office of mental health, is essential to such defendant's welfare and that his judgment is so impaired that he is unable to understand the need for such care and treatment . . . ." CPL § 330.20(1)(d).
 The mental hygiene law defines "mental illness" as "an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation." N.Y. Mental Hyg. Law § 1.03(20). Thus, the CPL's definition of "mentally ill" includes only a subset of those suffering from a "mental illness" as defined by the mental hygiene law--those whose mental illness requires in-patient treatment.
 
 
 [4]
 "'Order of conditions' means an order directing a defendant to comply with this [sic] prescribed treatment plan, or any other condition which the court determines to be reasonably necessary or appropriate, and, in addition, where a defendant is in custody of the commissioner [of mental health], not to leave the facility without authorization. The order shall be valid for five years from the date of its issuance, except that, for good cause shown, the court may extend the period for an additional five years." CPL § 330.20(1)(o).
 
 
 [5]
 Francis was also arrested five times in 1988 and 1989 for shoplifting and aggravated assault on a police officer; for driving while intoxicated; for assault, resisting arrest, menacing, and criminal possession of a weapon; and twice for criminal mischief. Francis pled guilty and served short jail terms for the latter two arrests.
 
 
 [6]
 This determination possibly constituted a third determination that Francis was not dangerous. Because Francis was being hospitalized pursuant to the July 1990 determination of mental illness (but not dangerous mental illness), the Mental Hygiene Law governed his retention. See CPL § 330.20(7), (14). As a result of the hearing, Francis was released pursuant to an order of conditions, under which he was required to obtain outpatient care. Because the Mental Hygiene Law at that time did not authorize involuntary outpatient treatment, see N.Y. Mental Hyg. Law § 9.61 (1996 & Supp. 2000) (enacted 1994), Francis's release would have been pursuant to § 9.31(c), which authorizes transfer of a patient to relatives who are willing and able to care for him. Although the statute is not clear on the point, it may be that such a transfer is permissible only when the patient has not been found "in need of retention," i.e., "unable to understand the need for ... care and treatment," id. § 9.01 (defining "need for retention" and "in need of involuntary care and treatment"), and therefore a danger to himself. See John P., 697 N.Y.S.2d at 121 (interpreting "in need of involuntary care and treatment" under the Mental Hygiene Law to mean "establish[ing] by clear and convincing evidence that the patient is mentally ill and in need of further care and treatment, and that the patient poses a substantial threat of physical harm to himself or to others").
 
 
 [7]
 Francis was also arrested several times over this period: in June 1991 in New Jersey for weapons possession and driving while intoxicated; in July 1991, for assault with intent to cause injury to an officer, resisting arrest, and disorderly conduct; in July 1992, for criminal mischief; in September 1992, for criminal possession of a weapon, menacing, and possession of hypodermic needles. The 1992 charges were dismissed to permit the Commissioner to proceed with the contested recommitment application.
 
 
 [8]
 The initial application, dated August 4, 1992, was replaced with a revised application on August 28, 1992.
 
 
 [9]
 A fourth claim, concerning defective service of the recommitment order, was ruled waived for lack of procedurally proper presentation in the state courts. See Francis S., 995 F. Supp. at 378-82.
 
 
 [10]
 We note that the focus of Congress's effort in restricting the scope of federal habeas corpus was state court judgments convicting criminal defendants, rather than adjudicating the commitment, or in this case the recommitment, of those alleged to be mentally ill and likely to engage in dangerous conduct. But the statute applies to "any claim that was adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), and we do not believe that it may be applied less deferentially to an order recommitting an NRRMDD defendant than to judgments of conviction.
 
 
 [11]
 Justice Scalia did not join footnote *, see Terry Williams, 120 S. Ct. at 1521 n.*, to Part II of Justice O'Connor's opinion. See id. at 1516.
 
 
 [12]
 Justice O'Connor took some comfort in the fact that "unreasonable" is "a common term in the legal world and, accordingly, federal judges are familiar with its meaning." Terry Williams, 120 S. Ct. at 1522. The difficulty, of course, is that we are familiar with its many meanings in the different contexts in which the word (or its antonym) is used. See, e.g., Wyoming v. Houghton, 526 U.S. 295, 299-300 (1999) (unreasonable search and seizure); Faragher v. City of Boca Raton, 524 U.S. 775, 778 (1998) (reasonable care to prevent sexual harassment); Atchison, Topeka & Santa Fe Railway Co. v. Buell, 480 U.S. 557, 558 (1987) (reasonable care to furnish safe place to work); Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 23-24 (1979) (unreasonable restraint of trade); In re Winship, 397 U.S. 358, 363-64 (1970) (reasonable doubt). We have no experience in determining when a state court has made an unreasonable application of constitutional law, as expounded by the Supreme Court.
 
 
 [13]
 Four years after Foucha was found not guilty by reason of insanity, a three-member panel at the institution where he was confined "reported that there had been no evidence of mental illness since admission," Foucha, 504 U.S. at 74, and a two-member panel appointed by the state trial court reported that he was "presently in remission from mental illness," id. (internal quotation marks omitted). And the Supreme Court noted that "Louisiana does not contend that Foucha was mentally ill at the time of the trial court's hearing." Id. at 78.
 
 
 [14]
 We acknowledge that two circuits have considered the issue of dangerous mental illness to be a mixed question of law and fact. See Levine v. Torvik, 986 F.2d 1506, 1514 (6th Cir. 1993); Dixon v. Jacobs, 427 F.2d 589, 595 n.17 (D.C. Cir. 1970). The force of Levine is rendered doubtful by its reliance on Card v. Singletary, 963 F.2d 1440, 1444 n.4 (11th Cir.), revised, 981 F.2d 481, 484 n.6 (11th Cir. 1992) (competency to stand trial is mixed question), which the Eleventh Circuit has subsequently repudiated, see United States v. Hogan, 986 F.2d 1364, 1372 (11th Cir. 1993). Although Levine also relies on Dixon, that case was decided long before the cases cited in the text of this opinion, and we are unpersuaded by the D.C. Circuit's reasoning in Dixon in light of the more recent case law.
 
 
 [15]
 In the portion of the opinion of Justice Stevens that was not adopted by the majority of the Court, he reads section 2254(d)(2) as an affirmative command that "provides for the habeas remedy when a state-court decision 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Terry Williams, 120 S. Ct. at 1509 (opinion of Stevens, J.) (quoting section 2254(d)(2)) (emphasis in opinion).
 
 
 [16]
 Aspects of the opinions of Dr. Cruz and Dr. Poundstone have a disquieting Catch-22 quality. Dr. Cruz insisted that Francis's unwillingness to accept the doctor's diagnosis of his mental condition is itself indicative of a lack of "insight" that is symptomatic of mental illness. Presumably, those not mentally ill will also deny a suggestion that they suffer from a mental illness, even when the diagnosis comes from a qualified psychiatrist. Similarly, Dr. Poundstone's reliance on Francis's lack of dangerous behavior while hospitalized ignores the fact that those not mentally ill would presumably also refrain from dangerous conduct while hospitalized (unless their wrongful confinement provoked them beyond their powers of self-control).
 
 
 [17]
 There were periods when Francis was prescribed Cylert for his attention-deficit disorder, but refused to take Prolixin, which had been prescribed as an antipsychotic medication.