Andrew BROWN, Petitioner–Appellant,

v.

Christopher ARTUZ, Superintendent, Respondent–Appellee.

Docket No. 00–2516.

United States Court of Appeals, Second Circuit.

Submitted Sept. 13, 2001.

Decided March 13, 2002.

Michael G. Paul, New York, NY, for Petitioner–Appellant.

John M. Castellano, Johnette Traill, Alyson J. Gill, Assistant District Attorneys,

Queens County, Kew Gardens, NY, (Richard A. Brown, District Attorney, Queens County, Kew Gardens, NY), for Respondent–Appellee.

Before: KEARSE, MINER, and F.I. PARKER, Circuit Judges.

MINER, Circuit Judge.

Petitioner-appellant Andrew Brown appeals from a judgment of the United States District Court for the Eastern District of New York (Sifton, *J.*) denying his petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. In 1995, Brown was sentenced in the New York State Supreme Court, Queens County, to a prison term of between nine and eighteen years after a jury found him guilty of sale of a controlled substance in the third degree and sale of a controlled substance on or near school grounds in violation of New York Penal Law sections 220.39(1) and 220.44(2). In his *pro se* petition to the district court, Brown contended, *inter alia*, that his Sixth Amendment right to a public trial was violated when the state court "clear[ed] the Courtroom" during the testimony of an undercover officer. The district court denied the petition, but granted Brown's motion for a certificate of appealability on the sole question of whether his Sixth Amendment right to a public trial was violated. Because the state court's decision to close the courtroom during the testimony of the undercover officer was not "contrary to, [n]or [did it] involve[ ] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," we affirm.

## BACKGROUND

On March 1, 1995, New York City Undercover Police Officer 1445 (the "officer") participated in a "buy and bust" operation in an area designated by the police for the investigation of the sale of drugs. At about 6:45 p.m. on that date, the officer saw Brown standing beneath an awning in the vicinity of Sutphin Boulevard and Archer Avenue in the borough of Queens, City of New York. The officer approached Brown and asked him for "four nicks of crack," slang for twenty dollars worth of crack-cocaine. In response, Brown led the officer to a nearby bar located at 91–14 Sutphin Boulevard. Once inside the bar, Brown introduced the officer to Shirelle Evans and instructed her to give the officer four "nicks." Evans gave the officer four plastic vials that contained crack-cocaine, and he gave her twenty dollars in prerecorded money. The officer then left the bar, and immediately radioed the details of the sale, including descriptions of Brown and Evans and their location, to his back-up team. After receiving the call, the back-up team entered the bar and arrested Brown and Evans. The officer drove past the scene shortly after the arrest and recognized Brown and Evans as the people who had sold him the four vials of crack-cocaine.

Following an indictment by a Queens County grand jury, Brown was charged with one count of criminal sale of a controlled substance in the third degree and one count of criminal sale of a controlled substance on or near school grounds. N.Y. Penal Law §§ 220.39(1), 220.44(2). A jury trial was held in the New York State Supreme Court, Queens County. On the first day of trial, the People moved to close the courtroom to the public during the upcoming testimony of the officer. In response to the People's motion, the court held a closed hearing pursuant to *People v. Hinton,* 31 N.Y.2d 71, 286 N.E.2d 265, 334 N.Y.S.2d 885 (1972). The *Hinton* hearing consisted solely of the testimony of the officer.

On direct examination at the hearing, the officer testified that he had been a

member of the New York City Police Department for seven and one-half years, serving as an undercover detective for the last three and one-half years. As an undercover detective, the officer was assigned to purchase narcotics. The officer's testimony revealed that he was currently working undercover in Queens, New York, in the areas of Sutphin Boulevard and Archer Avenue, 150th Street and South Road, Jamaica Avenue and Sutphin Boulevard, and Jamaica Avenue and Hillside Avenue. The officer also testified that he had worked undercover in the area of Sutphin Boulevard and Archer Avenue, an area one block from the courthouse, the day before Brown's trial began, and expected to work undercover in that area the very next day. The officer also explained that he had "about five" open cases in the New York Supreme Court, "about five" cases pending in the grand jury, and a number of unapprehended subjects.

Testifying with regard to the dangerous nature of undercover work, the officer explained that during previous undercover operations he had been shot at and had bottles thrown at him. The officer testified that he had taken certain precautions to conceal his identity the day of the hearing, such as wearing a different type of clothing and entering the courthouse through a nonpublic doorway. The officer then explained that he feared testifying in open court because "[m]y safety will be blown. My cover will be blown. My safety will be shot basically." On cross-examination the officer revealed that in the last seven months he had "dual status," meaning that he was employed as both an arresting investigator and as an undercover officer. When asked to explain his dual status, the officer stated: "I have been an investigator for the last seven months. I have dual status which means in certain areas I make buys and [in] certain areas I make apprehensions."

Following the officer's hearing testimony, the court granted the People's motion for a limited closure of the courtroom, over Brown's objection:

After hearing the testimony of [the officer], this court will grant the People's application to close the courtroom during his testimony. We think that his safety that has shown [sic] that this is the area that he works in. Although he hasn't made any buys at this address, 91–14 [Sutphin Boulevard,] since that time, . . . he is working in that neighborhood.

He says that he expects to return to Sutphin Boulevard and Archer [A]venue which is the next block tomorrow, that he has five pending open cases, and five in the grand jury, and this is the locale that he is operating in, the Sutphin Boulevard, Jamaica Avenue, Archer Avenue area, so [that] the safety of this officer, and his identification . . . will not be, to use his words[,] . . . blown, we will close the courtroom during testimony.

At trial, the prosecution's witnesses consisted of the officer, the arresting officer, and the chemist who analyzed the drugs sold by Brown to the officer. Brown did not offer any witnesses of his own. The jury convicted Brown on both counts, and, on January 25, 1995, he was sentenced in the Supreme Court as a predicate felon to a prison term of nine to eighteen years.

On December 16, 1995, Brown filed an appeal with the New York State Appellate Division of the Supreme Court, Second Department. In his appeal Brown argued that (i) the court should have instructed the jury on an agency defense, (ii) the court erred in closing the courtroom during the testimony of the officer, (iii) the prosecution engaged in discrimination during jury selection, and (iv) his guilt was not proven beyond a reasonable doubt. On September 29, 1997, a four-judge panel

unanimously affirmed Brown's conviction in a short published opinion that concentrated on Brown's argument that his guilt was not proven beyond a reasonable doubt. *See People v. Brown,* 242 A.D.2d 730, 664 N.Y.S.2d 929 (2d Dep't 1997) (*"Brown I"*). As to his other claims, the Appellate Division stated that "[Brown's] remaining contentions are without merit." *Id.* By letter dated October 3, 1997, Brown sought review by the New York Court of Appeals on all of the issues advanced before the Appellate Division. On November 24, 1997, the New York Court of Appeals denied Brown's motion for leave to appeal. *People v. Brown,* 91 N.Y.2d 833, 690 N.E.2d 495, 667 N.Y.S.2d 686 (1997).

■ In December 1998, Brown filed a *pro se* application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of New York.[1] Brown's petition included claims that were raised on his appeal to the Appellate Division, including the Sixth Amendment claim, and also a new claim of excessive punishment. In an unpublished memorandum and order dated July 12, 2000, the district court denied the petition. However, upon finding that Brown had made a "substantial showing of the denial of a constitutional right with his claim of improper trial closure," the district court granted Brown a certificate of appealability on the sole issue of whether the courtroom closure violated Brown's Sixth Amendment right to a public trial. In granting the certificate, the district court noted that "the questions presented [in Brown's closure argument]

are 'deserving of further proceedings' because the Second Circuit has recently granted *en banc* review on this very issue for the second time in three years."

This appeal followed.

## DISCUSSION

### I. Standard of Review

■ We review *de novo* a district court's decision to grant or deny a petition for a writ of habeas corpus. *Clark v. Stinson,* 214 F.3d 315, 319 (2d Cir.2000). Prior to the 1996 passage of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), P.L. No. 104–132, 110 Stat. 1214 (1996), state court factual findings after a "hearing on the merits" were "presumed ... correct" in federal habeas corpus proceedings with certain exceptions, such as the failure of the fact-finding procedure to afford a full and fair hearing. 28 U.S.C. § 2254(d) (1994). However, federal courts were not required to defer to state court determinations of law and of mixed questions of law and fact. *Thompson v. Keohane,* 516 U.S. 99, 107–13, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). When presented with these types of questions, federal courts were empowered to conduct an independent review of the record. *Id.* at 113, 116 S.Ct. 457. The AEDPA required a new, more deferential standard: it "placed a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners." *Williams v. Taylor,* 529 U.S. 362, 399, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

1. Section 2244 provides that a one-year period of limitation running from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review," applies to habeas petitions filed by state prisoners. 28 U.S.C. § 2244(d)(1)(A). Brown's petition was timely, since it was filed within one year after his "time to seek direct review via certiorari

ha[d] expired." *Williams v. Artuz,* 237 F.3d 147, 151 (2d Cir.2001); Sup.Ct. R. 13(1) ("[A] petition for a writ of certiorari to review a judgment ... entered by a state court of last resort ... is timely when it is filed ... within 90 days after entry of judgment."). *Cf. Crawley v. Catoe,* 257 F.3d 395, 398–99 (4th Cir. 2001).

Under the AEDPA, a writ of habeas corpus may not issue "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication ... resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (2001).[2] In addition, the AEDPA instructs that state court findings of fact "shall be presumed correct," rebuttable only upon a showing of "clear and convincing evidence." *Id.* § 2254(e)(1). If a state court has failed to adjudicate a claim "on the merits," § 2254 does not apply, and we apply the pre-AEDPA standard of review, reviewing both questions of law and mixed questions of law and fact *de novo. Washington v. Schriver*, 255 F.3d 45, 55 (2d Cir.2001).

Accordingly, in order to determine which level of deference to apply, we must decide whether Brown's Sixth Amendment claim was adjudicated on the merits. A state court "adjudicates" a petitioner's federal constitutional claims "on the merits" whenever "it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir.2001). In analyzing this two-part test, we consider: "(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits." *Id.* at 314 (quoting *Mercadel v. Cain*, 179 F.3d 271, 274 (5th Cir.1999)) (internal quotation marks omitted). In applying these three considerations, we have given a broad

reading to state court dispositions, explaining that "[a] state court need only dispose of the petitioner's federal claim on substantive grounds, and reduce that disposition to judgment. No further articulation of its rationale or elucidation of its reasoning process is required." *Aparicio v. Artuz*, 269 F.3d 78, 93–94 (2d Cir.2001) (citing *Sellan*, 261 F.3d at 312).

We have held that the state court need not mention the argument raised or cite relevant case law in order for its ruling to constitute an "adjudication on the merits." *Id.* at 94; *Sellan*, 261 F.3d at 312 (explaining that "[n]othing in the phrase 'adjudicated on the merits' requires the state court to have explained its reasoning process"). Here, the Appellate Division only discussed Brown's sufficiency of the evidence argument. *See Brown I*, 242 A.D.2d at 730, 664 N.Y.S.2d 929. The court dismissed Brown's other arguments, including his Sixth Amendment claim, by stating: "[d]efendant's remaining contentions are without merit." *Id.* Because there is no basis either in the history of the case or the opinion of the Appellate Division for believing that Brown's Sixth Amendment claim was denied on procedural or any other nonsubstantive grounds, we find that his claim was "adjudicat[ed] on the merits" by the state court, and therefore review his Sixth Amendment claim under the more deferential standard set forth in § 2254. *See Sellan*, 261 F.3d at 314.

## II. *The Right to a Public Trial*

The right to a public trial stems from a belief that a trial witnessed by members of the community improves the quality of witness testimony and boosts community trust in the administration of

**2.** The AEDPA's standards for reviewing state court findings and conclusions apply to any petition filed, as Brown's was, after April 24, 1996, the AEDPA's effective date. *Williams*, 529 U.S. at 402, 120 S.Ct. 1495.

justice. *Brown v. Kuhlmann*, 142 F.3d 529, 534–36 (2d Cir.1998). The right to a public trial exists not only for the accused, as articulated in the Sixth Amendment,[3] but also for the press and public as a First Amendment right. *See Richmond Newspapers v. Commonwealth of Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). This right is of such importance that any error affecting it is deemed "structural," making the denial of the right one of the "limited class of cases" where reversal is automatic. *Johnson v. United States*, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). However, the entitlement to a public trial is not absolute: "[T]he right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller v. Georgia*, 467 U.S. 39, 45, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). The Supreme Court has instructed that the instances where courtroom closure will be warranted are "rare," cautioning that "the balance of interests must be struck with special care." *Id.*

*Waller* dealt with the constitutional implications of a state trial court's decision to close the courtroom for the entirety of a seven-day suppression hearing. The Supreme Court there set forth a four-prong test for evaluating the constitutionality of courtroom closures during criminal proceedings, requiring that

> [1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than neces-

sary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] [the court] must make findings adequate to support the closure.

*Id.* at 48, 104 S.Ct. 2210. Applying this test to the facts in *Waller*, the Court held the closure unconstitutional. *Id.*

Since the Court's decision in *Waller*, we have on numerous occasions applied its four-part test. In the context of so-called "buy and bust" cases, we have interpreted *Waller* to impose specific requirements on trial courts in order to justify courtroom closures during the testimony of undercover police officers. For example, we have held that the trial court must "require persuasive evidence of serious risk to an important interest in ordering any closure," *Ayala v. Speckard*, 131 F.3d 62, 70 (2d Cir.1997) (en banc) ("*Ayala*"), and that "the more extensive . . . the closure requested, the greater . . . the gravity of the required interest and the likelihood of risk to that interest," *id.* We have also recognized "a special concern for assuring the attendance of family members of the accused." *Vidal v. Williams*, 31 F.3d 67, 69 (2d Cir.1994) (holding that a trial court is not permitted to deny a defendant's family access to his trial simply because the family lives in the same borough in which the undercover officer seeking closure works).

Our interpretation and application of the *Waller* test in buy and bust cases have not been an altogether consistent endeavor. For example, we first held that a trial court was required to consider alternatives to closure *sua sponte* under the third

---

**3.** The Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.
>
> U.S. Const. amend. VI.

prong of *Waller, see Ayala v. Speckard,* 89 F.3d 91 (2d Cir.1996), *adhered to on rehearing,* 102 F.3d 649 (2d Cir.1996) (per curiam), and at least two other panels of our Court followed that holding, *see Pearson v. James,* 105 F.3d 828 (2d Cir.1997); *Okonkwo v. Lacy,* 104 F.3d 21 (2d Cir. 1997). In an *en banc* rehearing of *Ayala, Pearson,* and *Okonkwo,* we reversed our previous holdings, concluding that *Waller* does *not* require a trial court to consider further alternatives *sua sponte* once the trial judge has determined that limited closure as an alternative to complete closure is justified. *Ayala,* 131 F.3d at 71.[4] We also convened an *en banc* rehearing to determine the degree of particularity with which an undercover officer must testify in order to satisfy the first *Waller* prong. *Brown v. Andrews,* 220 F.3d 634 (2d Cir. 2000) (per curiam) (en banc). Before reaching a conclusion in that case, however, the rehearing was dissolved and our previous opinion vacated, leaving that question unsettled. *Id.*

Thus, as the district court noted, we have recently convened two *en banc* rehearings in an effort to further clarify what is constitutionally required under *Waller* in regard to courtroom closure during the testimony of an undercover officer. However, with the passage of the AEDPA we are now constrained to apply *Waller* under a more deferential standard, which only permits a writ of habeas corpus to issue if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States." 28 U.S.C. § 2254(d)(1). Accordingly, our review of courtroom closures by state courts for undercover officer testimony is now significantly restricted by virtue of the new, more deferential standard.

### III. *Courtroom Closure in This Case*

Under the AEDPA, we must first determine whether the principle of federal law upon which Brown relies was "clearly established" by Supreme Court precedent when the state court closed the courtroom. *Williams v. Artuz,* 237 F.3d 147, 152 (2d Cir.2001); 28 U.S.C. § 2254(d)(1). As discussed above, *Waller* recognized that, subject to certain limitations, the right to a public trial is clearly established federal law. 467 U.S. at 44, 104 S.Ct. 2210. Thus, the state court's decision will stand unless it was "contrary to" or involved an "unreasonable application" of the federal constitutional law clearly established in *Waller.* 28 U.S.C. § 2254(d)(1).

A decision is "contrary to" clearly established federal law as determined by the Supreme Court if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Taylor,* 529 U.S. at 413, 120 S.Ct. 1495. The state court's decision to close the courtroom during the officer's testimony in this case was not bottomed on a view of the law "contrary to" the rule established in *Waller* or in any other Su-

---

**4.** The New York Court of Appeals had held that under the third prong of *Waller* a trial court was not required *sua sponte* to consider alternatives to closure, *People v. Martinez,* 82 N.Y.2d 436, 444, 624 N.E.2d 1027, 1031, 604 N.Y.S.2d 932, 936 (1993), and lower New York courts then followed that rule, *see, e.g., People v. Ford,* 235 A.D.2d 285, 285, 654 N.Y.S.2d 2, 3 (1st Dep't 1997) (declining to

follow *Ayala*); *People v. Lugo,* 233 A.D.2d 197, 198, 650 N.Y.S.2d 102, 103 (1st Dep't 1996) (explaining that "where there is a conflict between the decisional law of the [New York] Court of Appeals and that of an intermediate Federal appellate court on a constitutional issue, the ruling of the state Court of Appeals should be followed").

preme Court decision. Accordingly, in order to succeed in his petition, Brown must show that the state court decision "involved an unreasonable application" of clearly established federal law. 28 U.S.C. § 2254(d)(1).

A decision is an "unreasonable application" of clearly established Supreme Court law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Taylor*, 529 U.S. at 413, 120 S.Ct. 1495. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495. In order to grant the writ there must be "[s]ome increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted). Under the "unreasonable application" prong, "we must determine not whether the state court was incorrect or erroneous ..., but whether [the state court's decision] was 'objectively unreasonable.'" *Sellan*, 261 F.3d at 315. Moreover, the unreasonable application of federal law must be referable to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *Taylor*, 529 U.S. at 412, 120 S.Ct. 1495.

Brown argues that the state court decision to close the courtroom during the testimony of the officer was an unreasonable application of the Supreme Court's holding in *Waller*. Specifically, Brown contends that the state failed to meet the first prong of the *Waller* test, claiming that "the officer's testimony failed to establish the necessary link between his fear for his safety and his open court testimony." In support of this argument, Brown claims that the officer's fear for his safety was undermined by the fact that the officer had worked as an investigator who made arrests as well as worked undercover during the last seven months. Under the first prong of *Waller*, in order to justify courtroom closure the state must show an "overriding interest that is likely to be prejudiced." 467 U.S. at 48, 104 S.Ct. 2210. Here, the state's purported overriding interest was the officer's safety. In order to show that the officer's safety would be "prejudiced" by open-court testimony, the officer testified that he still worked undercover in the neighborhood where Brown's arrest took place. The officer also testified to the dangerous nature of undercover work by recounting incidents where he had bottles thrown at him and was shot at in the course of conducting buy and bust operations. In addition, the officer's testimony revealed that the courthouse was in the general vicinity of the area in which he worked undercover.

In light of this testimony, we conclude that the state court's decision to close the courtroom was not an "unreasonable application" of the first prong of *Waller*. The safety of a police officer working undercover surely constitutes an overriding interest. Of course, the mere invocation of officer safety does not justify the closing of a courtroom. Under the first prong of *Waller*, an officer must show facts that tend to support his fear. *Id.* The officer's testimony here satisfied this requirement. Although Brown's argument that the officer's duties in a nonundercover capacity undermined his safety concerns may not be entirely without merit, nonetheless we hold that the court's decision to

close the courtroom during the officer's testimony does not involve an unreasonable application of *Waller.*

Although Brown does not specifically argue that the closure was improper based on the other prongs of *Waller,* our review of the record satisfies us that the remaining prongs were not unreasonably applied. First, the state court closed the trial only during the officer's testimony; thus, the closure was no broader than necessary. Second, the transcript of the officer's testimony was available to the public, which we find to constitute a reasonable alternative to open-court testimony. Finally, as a result of the officer's testimony at the *Hinton* hearing, the trial court made findings adequate to support the closure. Accordingly, we find that the state court did not unreasonably apply the remaining *Waller* factors.

We here take note of the fact that the joint appendix furnished to us included neither a transcript of the officer's testimony at the *Hinton* hearing nor the full opinion of the district court. As a consequence, we were required to have our own circuit court clerk retrieve these documents from the office of the district court clerk in order to rule on Brown's appeal. We take this opportunity once again to alert the bar to the "hazards of an incomplete appendix." *Reiss v. Societe Centrale du Groupe des Assurances Nationales,* 235 F.3d 738, 746 (2d Cir.2000). A complete appendix is especially crucial in appeals such as this one, where our decision necessarily turns on the particular statements and rulings that are contained in omitted documents. *See* Roger J. Miner, *Common Disorders of the Appendix and Their Treatment,* 3 J. App. Prac. & Process 39, 40 (2001) (noting that "[t]he purpose of an appendix is to facilitate appellate review by placing before the appellate court ... those portions of the record that are pertinent to the specific issues raised

in the briefs submitted by the parties"). We trust that members of the bar will review carefully our Circuit's requirements for appendices set forth in Federal Rule of Appellate Procedure 30 and Second Circuit Rule 30 before submitting appendices to this Court in the future. Failure of the bar to comply with these requirements may result in severe sanctions, including dismissal of the appeal. *See Kushner v. Winterthur Swiss Ins. Co.,* 620 F.2d 404 (3d Cir.1980).

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.