Jose **RODRIGUEZ**, Petitioner–Appellant,

v.

David **MILLER**, Superintendent, Eastern Correctional Facility, Respondent–Appellee.

**Docket No. 04–6665–PR.**

United States Court of Appeals, Second Circuit.

Argued: Nov. 2, 2005.

Decided: Feb. 17, 2006.

Katheryne M. Martone, Legal Aid Society, Criminal Appeals Bureau, New York, N.Y. (Mitchell J. Briskey, on the brief) for Petitioner–Appellant.

Victor Barall, Assistant District Attorney, for Charles J. Hynes, District Attorney, Kings County, Brooklyn, N.Y. (Leonard Joblove, on the brief) for Respondent–Appellee.

Before: CARDAMONE, McLAUGHLIN, and B.D. PARKER, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Jose Rodriguez sought a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He claims that the state trial court's exclusion of his mother and brother during the testimony of an undercover officer, unless they consented to sitting behind a screen, violated his Sixth Amendment right to public trial. The United States District Court for the Eastern District of New York (Block, J.) denied Rodriguez's petition. *See Rodriguez v. Miller*, No. 00–cv–3832, 2001 WL 1301732 (E.D.N.Y. Oct.22, 2001).

Following an appeal by Rodriguez, this Court vacated and remanded for further consideration. *See Rodriguez v. Miller*, 82 Fed.Appx. 715 (2d Cir.2003). On remand, the district court again denied the petition. *See Rodriguez v. Miller*, No. 00–cv–3832, 2004 WL 3567978 (E.D.N.Y. Nov. 24, 2004). He now appeals that order.

## BACKGROUND

In December 1995, Rodriguez stood trial in New York State Supreme Court, Kings County, on three counts of criminal sale of a controlled substance, two counts of criminal possession of a controlled substance in the second degree, and three counts of criminal possession of a controlled substance in the third degree.

At trial, the sole witness for the prosecution was Undercover Officer 1068 (the "Undercover"), to whom Rodriguez had sold cocaine. The prosecution moved to have the courtroom closed during the Undercover's testimony, thus prompting the court to conduct a hearing to determine the propriety and scope of a closure pursuant to *People v. Hinton*, 31 N.Y.2d 71, 334 N.Y.S.2d 885, 286 N.E.2d 265 (1972).

The Undercover, the lone witness at the hearing, testified as follows.

He had been an undercover officer for two-and-a-half years, and during that time he had been involved in "buy and bust operations and long term investigations" in the Bushwick area of Brooklyn. He intended to return to Bushwick "in the near future." The Undercover added that he had received numerous threats in cases arising from his work in the Bushwick area and had some "lost subjects," *i.e.*, "buy and bust" subjects who had evaded arrest in Bushwick.

The Undercover further stated that, although he had appeared in many drug cases, he had never testified in open court. Nor had he revealed his name in appearances before the grand jury. The Undercover also claimed that he feared testifying in front of Rodriguez's relatives at trial, explaining that "if any of [Rodriguez's] family, relatives or friends see me, they'll be able to know I am a police officer and go back and spread the word around."

On cross-examination, the Undercover admitted that Rodriguez had never threatened him and he had never seen Rodriguez, or any of his associates, in possession of a gun. Additionally, the Undercover

conceded that he did not know any of Rodriguez's relatives, and had no reason to believe that Rodriguez's mother was involved in drug dealing. Finally, the Undercover stated that he had never been directly threatened, but instead, had only learned of potential threats via conversations with informants.

Following this testimony, the prosecution renewed its request to have the courtroom closed during the Undercover's testimony. Specifically, the prosecution argued that the Undercover's fear that his identity would be revealed and that drug dealers in Bushwick could find out about his undercover status justified the closure. In response, Rodriguez's counsel reminded the court that it "[had] to make certain findings in order to close the courtroom." The court retorted that "what the witness said seems to fit the parameters . . . set forth in the cases. He's going back to the neighborhood, expects to go back to the neighborhood, he's still working in the neighborhood, lost subjects, fear for personal safety. It's well founded, it would seem."

Rodriguez's counsel conceded that some form of closure was necessary but argued that relevant state precedent precluded the court from excluding the Petitioner's family. The court inquired as to what family members would attend the trial on the day of the Undercover's testimony. Rodriguez's counsel replied that Rodriguez's mother "might possibly" attend. The prosecution objected to the mother's attendance, reasoning that "[i]f [the mother] tells somebody [that] this undercover will be testifying back and forth [for] several days in this building and be in the area, she can point him out to somebody." Rather than rule on whether the mother could attend, the court adjourned, stating "we'll concern ourselves with [this issue] if

and when there is a desire on the part of the defendant's mother to attend."

The next day, Rodriguez's mother and brother sought entry into the courtroom prior to the Undercover's testimony. The court ruled that closure was necessary, but it would permit Rodriguez's mother and brother to attend the proceedings provided a screen was set up "so that the jury is in a position to observe the witness, but not the people in the spectator's section." The court made no particular findings as to why the exclusion of Rodriguez's mother and brother was necessary.

Rodriguez's attorney objected to the use of the screen, and stated that he would direct Rodriguez's mother and brother to wait outside the courtroom. He chose this approach out of fear that the "screen creates a substantial amount of prejudice . . . because the only thing that the jury can conclude is that the screen is being set up so that spectators can't see the witness and that means the witness is in danger." The court offered to give any reasonable curative instructions to allay this concern. Rodriguez's attorney rejected the offer.

Rodriguez was eventually convicted. He appealed his conviction to the Appellate Division, Second Department, arguing that the closure order deprived him of his right to a public trial. The Appellate Division affirmed, stating that "[t]he court properly exercised its discretion when it closed the courtroom during the [Undercover's testimony]. The officer testified that he would be returning to the area where the arrest took place—an area where he had been threatened—and that if his identity was revealed that information could be disseminated in that area, resulting in his safety being jeopardized." *People v. Rodriguez*, 258 A.D.2d 483, 685 N.Y.S.2d 252 (2d Dep't 1999). Leave to appeal to the New York Court of Appeals was denied. *People v. Rodriguez*, 93 N.Y.2d 978, 695 N.Y.S.2d 64, 716 N.E.2d 1109 (1999).

In June 2000, Rodriguez filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of New York. He claimed that the trial court violated his Sixth Amendment right to a public trial when it conditioned the attendance of his mother and brother at the Undercover's testimony upon their sitting behind a screen. The district court denied the petition, finding that "[e]ven if incorrect, it certainly cannot be concluded that the [state court's] decision was unreasonable." *Rodriguez v. Miller*, No. 00–cv–3832, 2001 WL 1301732, at *5 (E.D.N.Y. Oct. 22, 2001).

In November 2003, following an appeal by Rodriguez, this Court vacated the judgment of the district court and remanded for reconsideration in light of *Yung v. Walker*, 341 F.3d 104, 111 (2d Cir.2003) (holding that, in order to exclude a relative, the court must be convinced that the "exclusion of that particular relative is necessary to protect the overriding interest at stake"). *See Rodriguez v. Miller*, 82 Fed. Appx. 715, 716 (2d Cir.2003). This Court also instructed the district court to examine:

> (1) whether it was necessary to exclude Rodriguez's family members in order to ensure the safety and efficacy of the [Undercover]; (2) whether the use of a screen is properly characterized as a partial closure or as an alternative to closure within a *Waller* analysis; (3) whether assuming the use of the screen was an alternative to closure, it is a reasonable alternative within the meaning *Waller* given its potential prejudicial effect; and [ (4) ] whether assuming the use of the screen is a partial closure, the state court reasonably applied *Waller* by mandating the use of the screen.

*Id.*

On remand, the district court again denied Rodriguez's petition. *See Rodriguez v. Miller*, No. 00–cv–3832, 2004 WL 3567978 (E.D.N.Y. Nov.24, 2004). The district court judge methodically addressed our instructions.

*First*, he concluded that it was necessary to exclude Rodriguez's mother and brother because they "lived in close proximity to the area in which the [Undercover] was returning to resume his undercover duties ... creating a likelihood that either of them would encounter the officer in the course of their daily activities." *Id.* at *6. In so holding, the court considered new evidence—a Criminal Justice Agency Interview Report—indicating that Rodriguez's mother lived in the Bushwick area and that his brother lived nearby in Ridgewood, Queens. Rodriguez objected to this "new evidence."

*Second*, the district court characterized the use of the screen as an alternative to closure, not a partial closure, because "the use of a screen permits spectators to remain in the courtroom and listen contemporaneously to the witness's testimony." *Id.* at *8.

*Third*, in deciding whether the use of the screen is a reasonable alternative to closure, the district court recognized two countervailing interests: (1) "the government's interest in inhibiting the disclosure of sensitive information"; and (2) "the defendant's right to a fair and public trial." *Id.* at *9. Balancing these interests, the court "presume[d] that the use of a screen is not *per se* unreasonable." *Id.* Because it was not clear from the record what type of screen would be used or where it would have been placed—inquiries that the district court found were "incumbent upon the defendant to make"—the court declined to address the reasonableness issue. *Id.*

*Fourth*, the court held that even if the use of the screen constituted a partial clo-

sure rather than an alternative to closure, the trial court's decision to use a screen was constitutional. *Id.* at *10

The district court granted a Certificate of Appealability.

Rodriguez now appeals.

## DISCUSSION

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may award habeas corpus relief with respect to a claim adjudicated on the merits in state court only if the adjudication resulted in an outcome that: (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined· by the Supreme Court of the United States"; or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." [1] 28 U.S.C. § 2254(d).

 A state court adjudication is "contrary to" clearly established federal law only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* Under this standard, "a federal habeas court may not issue the writ simply because that court concludes on its independent judgment that the relevant state-

court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411, 120 S.Ct. 1495. "Some increment of incorrectness beyond error is required" in order to grant the writ. *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000). "[H]owever, ... the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* (internal quotations omitted).

 The Sixth Amendment commands that "the accused shall enjoy the right to a ... public trial." U.S. Const. Amend. VI. Intrinsic to the public trial right is an individual's right to have family members and friends present at his trial, a right "this Court takes very seriously." *Carson v. Fischer,* 421 F.3d 83, 91 (2d Cir.2005); *see also Guzman v. Scully,* 80 F.3d 772, 776 (2d Cir.1996) ("The exclusion of courtroom observers, especially a defendant's family members and friends, even from part of a criminal trial, is not a step to be taken lightly."); *Vidal v. Williams,* 31 F.3d 67, 69 (2d Cir.1994) (noting the Supreme Court's "special concern for assuring the attendance of family members of the accused"). However, the right of an accused to have a "public trial" is not absolute, and "may give way in certain cases to other rights or interests." *Waller v. Georgia,* 467 U.S. 39, 45, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984).

In *Waller,* the Supreme Court spoke definitively about courtroom closures: "(1) the party seeking to close the courtroom must advance an overriding interest that is likely to be prejudiced, (2) the closure must be no broader than necessary to protect that interest, (3) the trial court

---

1. Rodriguez does not suggest that the state court made an unreasonable determination of

the facts.

must consider reasonable alternatives to closing the proceedings, and (4) [the trial court] must make findings adequate to support the closure." *Ayala v. Speckard*, 131 F.3d 62, 69 (2d Cir.1997) (en banc) (citing *Waller*, 467 U.S. at 48, 104 S.Ct. 2210).

■ Rodriguez concedes that the state court's closure with respect to the *general public* was consistent with *Waller*. Thus, we need only consider whether the trial court's order, requiring Rodriguez's *family* to remain outside the courtroom unless they agreed to sit behind a screen, was an unreasonable application of *Waller*.[2]

The first two prongs of the *Waller* test ensure that a defendant's right to a public trial is abridged only to the extent necessary to protect any overriding interest. According to the State, the overriding interests here were the protection of the Undercover and the preservation of his effectiveness. Both of these concerns are solidly anchored, considering that the Undercover planned to return to work in Bushwick, and he was concerned that his safety would be jeopardized. *See Brown v. Artuz*, 283 F.3d 492, 501–02 (2d Cir. 2002) (the "safety of a police officer working undercover surely constitutes an overriding interest"); *Nieblas v. Smith*, 204 F.3d 29, 33 (2d Cir.1999) ("important interest" necessary for closure of courtroom includes the need to protect an undercover officer's anonymity and safety); *Ayala*, 131 F.3d at 72 (the "state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial interest").

■ These concerns may justify barring the attendance of the general public, but alone they do not support the exclusion of Rodriguez's mother and brother. A court must make "adequate" findings in order to exclude a family member. *Waller*, 467 U.S. at 48, 104 S.Ct. 2210. These findings must convince the court "that the exclusion of that particular relative is necessary to protect the overriding interest at stake." *Yung*, 341 F.3d at 111 (stating that "it would be an unreasonable interpretation of *Waller* for a court to deny [a request to be exempted from an exclusion] if the exclusion of that particular relative, under the specific circumstances at issue, is not necessary to promote the overriding interest"). Thus, any alleged threat posed by a family member to an undercover's safety or effectiveness must be established by more than mere speculation. Instead, the trial court must make a *"particularized inquiry* into whether [exclusion of the family member] was necessary to advance an overriding interest." *Carson*, 421 F.3d at 91.

Here, there was no particularized inquiry into whether Rodriguez's family posed any threat to the Undercover's safety or effectiveness beyond the conclusory statements of the Undercover. In fact, the trial court made *no* findings with respect to the mother or brother. Furthermore, the Undercover had never encountered nor did he even know anyone in Rodriguez's family. And there was no indication that either Rodriguez's mother or brother was dangerous, knew of his criminal activity, or was familiar with any of his associates.

The State emphasized that Rodriguez's mother and brother lived close to where

---

2. Rodriguez argues that the Appellate Division, "in upholding [the] baseless exclusion of [his] family members, refused to apply [the *Waller* test]." This is hyperbole. The Appellate Division, although never specifically mentioning *Waller v. Georgia,* applied the correct legal standard. The Appellate Division relied on state cases citing federal law, including *Waller. See, e.g., People v. Ramos,* 90 N.Y.2d 490, 662 N.Y.S.2d 739, 685 N.E.2d 492 (1997).

the Undercover operated and where he would be returning. While the trial court made no such finding, additional evidence submitted to the district court showed that Rodriguez's mother lived approximately twelve blocks from where the Undercover and Rodriguez conducted their drug deal and Rodriguez's brother lived within three blocks of another location where a drug deal between the Undercover and Rodriguez took place. The district court found this evidence compelling. We do not. Mere proximity is not enough to establish a threat to the Undercover's safety or efficacy. *See Vidal*, 31 F.3d at 69 (holding that, despite the fact that the parents lived within three miles of the arrest site, the exclusion of a defendant's parents was not necessary to protect the State's interest in assuring officer's safety, absent evidence that parents were inclined to harm a police officer or were likely to encounter the officer during an undercover operation).

The district court relied heavily on *Sevencan v. Herbert*, 342 F.3d 69, 77 (2d Cir.2003), to support its determination. Although it is a close question, we conclude that this reliance was misplaced. In *Sevencan*, we denied habeas relief and held that the trial court's exclusion of the defendant's wife was proper because the undercover testified that he intended to return to the area in which the defendant "plied his narcotics trade" and the trial court found it likely that he might encounter the defendant's wife. *Id.* The petitioner's case has a surface similarity to *Sevencan*. However, there are two crucial differences.

*First*, the *Sevencan* court's conclusion that there was a likelihood that the undercover and the defendant's wife would encounter each other was based on specific facts indicating that the defendant's wife "was likely to have encountered the undercover officer in the course of her daily activities." *Id.* It was not based on general proximity alone. *See id.*

*Second*, the trial court also made specific findings regarding the defendant's wife's familiarity with her husband's associates, many of whom were highly dangerous. *Id.* Thus, there was at least some modicum of evidence demonstrating an *actual* threat to the undercover from the defendant's wife if she were to witness his testimony. *See id.* (concluding that "Mrs. Sevencan is ... likely to be susceptible to requests from her husband's associates to inform them if she spotted the undercover officer"). Here, the district court's implicit finding that Rodriguez's mother and brother posed a threat rested only on conjecture.

The district court also found it "fair to glean from the trial record that the [Undercover] would be traveling to and from the courthouse to testify over a number of days, which heightened the risk to his safety because Rodriguez's mother or brother could point him out to others around the courthouse." There is no reason, however, to believe that the trial court could not have taken appropriate precautions to prevent Rodriguez's mother or brother from encountering him in or around the courthouse, such as permitting the Undercover to use an alternate entrance to the courtroom or courthouse.

Finally, the district court, as does the State, relied on the Undercover's testimony that he feared testifying in front of Rodriguez's family because it would enable them to disclose his identity to "people in the neighborhood that the defendant knows." However, such a naked assertion, without more, does not justify excluding a defendant's family members.

The parties dedicate much of their briefs to an issue that is close to casuistic: whether the use of a screen is an "alternative to closure" or a "partial closure." The distinction is significant because of how it

may affect the *Waller v. Georgia* analysis. Under the third prong of *Waller*, a court, having decided that some form of closure is necessary, must consider "reasonable alternatives to closure." If, however, the screen was a "partial closure," the *Waller* analysis remains unchanged. This Court has on several occasions treated screens as an alternative to closure. *See, e.g., Pearson v. James*, 105 F.3d 828, 830 (2d Cir. 1997) (noting that state court judge did not consider "alternatives, such as placing a screen between the undercover officer and the spectators"); *Okonkwo v. Lacy*, 104 F.3d 21, 26 (2d Cir.1997) (discussing *Ayala*, we "suggested some possible alternatives to closure during [an undercover's] testimony: a strategically placed board to conceal the witness from public view"). We have used the term "partial closure" in situations where a closure lasts for only a limited period of time, *see, e.g., ABC, Inc. v. Stewart*, 360 F.3d 90, 105 (2d Cir.2004) (exclusion of public during *voir dire* considered "partial closure"), or excludes only a particular group of spectators, *see, e.g., English v. Artuz*, 164 F.3d 105, 109 (2d Cir.1998) (exclusion of just the defendant's family characterized as "partial closure").

We need not journey into this semantic bog for two reasons. First, a screen was never actually used, thus making this a less than ideal posture in which to decide where a screen falls on the spectrum of closures. Second, our ruling that any type of closure excluding Rodriguez's family was improper here makes it unnecessary to address "alternatives to closure" under *Waller*'s third prong.[3]

Recognizing that exclusion of family members requires stricter scrutiny than exclusion of the public, we hold that the trial court's findings, as supplemented by the district court, are insufficient to es-

tablish that the exclusion of Rodriguez's mother and brother was necessary to protect the State's overriding interest. Neither the State's contentions nor the district court's reasoning convince us otherwise. Thus, Rodriguez is entitled to the writ he seeks.

## CONCLUSION

Because the trial court's closure order violated Rodriguez's Sixth Amendment right to a public trial, we REVERSE the judgment of the district court and REMAND with directions to grant the writ of habeas corpus, conditioned on the state's right to retrial within ninety days.

---

**3.** Additionally, in light of our holding, we need not address Rodriguez's contention that

the district court erred by expanding the record.